**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**D.N. STAFFORD and Flora C. Stafford,
Defendants-Appellants.**

No. 82–8738.

United States Court of Appeals,
Eleventh Circuit.

March 19, 1984.

---

William B.B. Smith, Atlanta, Ga., for defendants-appellants.

Glenn L. Archer, Jr., Asst. Atty. Gen., Tax Div., Michael L. Paup, Chief, Appellate Section, Stanley S. Shaw, Jr., Dept. of Justice, Washington, D.C., for plaintiff-appellee.

Before ANDERSON and CLARK, Circuit Judges, and DUMBAULD *, District Judge.

**R. LANIER ANDERSON, III, Circuit Judge:**

Taxpayers DeNean and Flora Stafford appeal the district court's summary judgment in favor of the government on their refund action for allegedly overpaid taxes. The refund action involves the Staffords' 1969 tax return, in which they did not account for their receipt of a limited partnership interest valued at $100,000. The taxpayers argue that the partnership share qualified for nonrecognition treatment under I.R.C. § 721(a) because it was received in "exchange" for "property" they contributed to the partnership.[1] The district court held that nonrecognition was not available because the taxpayers' contribution of a letter of intent to the partnership did not meet the exchange and property requirements of the statute. We conclude that the district court applied an improper legal standard and under the proper legal test several issues should have been decided in favor of the taxpayers. With regard to additional issues, we conclude that genuine issues of fact remain such that summary judgment for the government was inappropriate. We therefore reverse and remand.

## I. HISTORY OF THE CASE

The commercial transaction that underlies the current tax dispute has been discussed in previous opinions. *See Stafford v. United States,* 435 F.Supp. 1036 (M.D.Ga. 1977), *rev'd,* 611 F.2d 990 (5th Cir.1980), *on remand,* 552 F.Supp. 311 (M.D.Ga.1982). Nevertheless, the resolution of this case requires a detailed analysis of the facts. We therefore discuss the relevant aspects of the transaction.

Throughout the 1960's, DeNean Stafford worked as a real estate developer, often in projects involving hotel property. At least two of Stafford's projects had used financing from the Life Insurance Company of Georgia ("LOG"). The business relationship between Stafford and LOG had taken various forms depending on the project. The hotel development involved in the present case, however, was somewhat unique.

In the early 1960's, LOG acquired property in Atlanta and constructed its corporate headquarters. LOG also owned the land adjacent to the headquarters, which at the time was undeveloped. LOG officials, in particular Mr. H. Talmadge Dobbs, who was then an executive vice president and member of the finance committee, approached Stafford and began negotiations for construction of a hotel complex on the unused land. In February of 1967, the LOG finance committee officially authorized continued discussions with Stafford on the hotel development.[2]

Negotiations between Stafford and LOG led to a July 2, 1968, letter from Mr. Dobbs to Stafford, setting forth the numerous points of agreement as of that date and additional details in need of future resolution. In particular, the letter promised 6¾% interest on the loan financing for the hotel and it specified lease terms; both the interest rate and lease terms were very favorable to Stafford given then existing market conditions.[3] Mr. Dobbs sent addi-

---

* Hon. Edward Dumbauld, U.S. District Judge for the Western District of Pennsylvania, sitting by designation.

1. I.R.C. § 721(a) (28 U.S.C.A. (1982)) provides:
   (a) General Rule.—No gain or loss shall be recognized to a partnership or to any of its partners in the case of a contribution of property to the partnership in exchange for an interest in the partnership.

2. The official authorization from the finance committee was to continue negotiations with DeNean Stafford for a 350-room hotel on the LOG site. The authorization contemplated a cost of $12,000 per room, a $3,000,000 loan from LOG, with an investment group formed by Stafford to provide an additional $1.2 million in equity.

3. The entire text of the July 2, 1968, letter of intent is reprinted as Exhibit A in the district court opinion. 552 F.Supp. at 314–15. The letter was prepared by LOG's corporate counsel and went out under Mr. Dobbs' signature. The letter began in paragraph 1 by stating: "We will lease [the hotel site] to you, or your designee, (limited partnership if you desire)." In paragraph 2, the letter set up a formula for calculating lease payments. Paragraph 5 indi-

tional correspondence to Stafford on July 3, 1968, indicating that the favorable conditions described in the July 2 letter would be open for Stafford's consideration for a period of 60 days.[4]

Under the terms of the July 2 letter, Stafford or his designee were to provide 25% equity for the hotel development. With letter in hand, Stafford contacted attorneys and business acquaintances and investigated the formation of a limited partnership to provide that equity share. On August 30, 1968, he responded to the LOG letter of July 2, accepting the general terms set forth in the letter and proposing further negotiation on additional details.[5]

On October 30, 1968, Mr. A.F. Irby, a business associate of Stafford's, contacted potential investors with a draft of a limited partnership agreement and details regarding the proposed development. The letter stated:

> You will note in this file that Mr. Stafford is delivering the lease, which is highly economic, the construction loan and the permanent financing to the partners for what amounts to $100,000 of additional

participation. The cost in the open market of procuring these three items would be in excess of $250,000 * * *

> The Life of Georgia will supply all of the construction funds but will require that $2,000,000 of equity be invested prior to their own advancement of construction monies.

> When you consider the fact that this is a very favorable tax arrangement, that the permanent loan is for 30 years at an interest of 6¾% and that the cost of the development is at least $1,500,000 less than it would be under ordinary circumstances this would appear to be an excellent deal.

In January of 1969, Stafford and a number of investors formed Center Investments, Ltd., a Georgia limited partnership, to pursue the development. Stafford was designated the sole general partner. He purchased two $100,000 shares and received a third limited partnership share for contributing to the partnership the letter of intent and the agreement with LOG contained therein.[6] In all, the partnership sold

---

cated that LOG contemplated a 400–450 room hotel at a cost somewhat greater than $12,000 per room. *Compare supra* note 2. Paragraphs 7 and 8 set the interest rate for the loan at 6¾ percent and required Stafford to provide 25% of the construction funds.

4. The July 3, 1968, letter from Mr. Dobbs to Stafford stated:

   Dear DeNean:
   With further reference to our letter of intent dated July 2, 1968, this is to add that the proposal is open only for prompt consideration. As we discussed recently, factors such as land value and interest rates have increased materially since our original discussions; therefore, the proposal should be considered as open for acceptance for a period of—say—60 days—to August 31, 1968.
   Trusting this will be more than adequate time for you to consummate all necessary arrangements and with highest personal regards,
   > Yours very truly,
   > H. Talmadge Dobbs

5. The acceptance letter stated:
   Dear Mr. Dobbs:
   This will acknowledge receipt of your letters of July 2 and 3, 1968, concerning construction of a hotel complex on a portion of the Life of Georgia Center.

You may consider this as evidence of our intent to proceed toward a finalization of plans and specifications and the required financing, along the lines set out in your letters subject to further negotiations on the following specific items.
   1. Rent value of the underground loading or service area. (Item 2(c))
   2. Parking. (Item 10)
   3. Commencement date of rent payments on ground lease.
   4. Rental options and/or lease term(s). As soon as these items can be resolved and plans and specifications sufficient to identify the land and air rights to be utilized are available, we will be in a position to enter into the necessary lease and contract agreements.
   > Yours very truly,
   > DeNean Stafford
   > General Partner of Partnership
   > to be formed

6. The letter of assignment provided:
   In consideration of initial 1/21 interest in Center Investments, Ltd., a limited partnership formed under the laws of the State of the Georgia (hereinafter referred to as the "partnership"), the undersigned hereby contributes to the partnership as a capital contribution, and does assign and transfer to the

20 units for $100,000 each, which together with the unit Stafford received for his capital contribution made a total of 21 units. Some eighteen months later, the partnership voted to amend the partnership agreement to provide Stafford a salary for his duties as general manager.

By mid-1970 the necessary capital had been raised and plans for the hotel development were set and approved. LOG and Center Investments executed formal lease and loan documents. The hotel project had expanded to a 550 room facility. This expansion, and unforeseen construction problems, had escalated the cost to over $9,000,000. LOG increased the amount of its loan to $7,127,500, but it substantially abided by the terms set forth in the July 2, 1968, letter to DeNean Stafford. LOG maintained the 6¾% interest rate on the first $5,000,000 it loaned to Center Investments. (The remaining $2,127,500 was financed at 9¾% interest, the market rate in 1970). LOG and Center Investments also followed the formula set forth in the July 2 letter as the method for calculating lease payments. These terms had become even more favorable to Center Investments than when first proposed, owing to changed market conditions.

On their 1969 joint federal tax return, the Staffords did not report as income their receipt of the third partnership share.[7] The Commissioner audited that return and determined that the Staffords should have treated the partnership share as compensation for services that Stafford rendered to the partnership in negotiating and developing the investment. The Commissioner thus concluded that the nonrecognition principles of § 721 did not apply to the third partnership share and assessed a deficiency of $64,000 plus interest. The Staffords paid the assessment and filed a claim for a refund.

After the Internal Revenue Service denied the refund claim, the taxpayers filed the present action in January of 1976. In 1977, after considering summary judgment motions by the government and the Staffords, the district court granted summary judgment to the Staffords on grounds that the taxpayers' 1969 receipt of the third limited partnership share qualified for nonrecognition treatment under I.R.C. § 721. *Stafford v. United States,* 435 F.Supp. 1036 (M.D.Ga.1977). The former Fifth Circuit reversed, *Stafford v. United States,* 611 F.2d 990 (5th Cir.1980), and remanded for resolution of an underlying factual dispute.

On remand, the parties supplemented the record in a June 24, 1981, evidentiary hearing. The district court, after considering cross-motions for summary judgment, granted summary judgment in favor of the government. *Stafford v. United States,* 552 F.Supp. 311 (M.D.Ga.1982). The taxpayers appealed to this court.

## II.  ISSUES ON APPEAL AND STANDARD OF REVIEW

The issues we now consider are easily stated. We must determine the proper tax characterization of the third partnership interest Stafford received. As was the situation when this case was last on appeal, we also consider the narrower issue of whether the district court properly granted a summary judgment.

With regard to this narrower issue, we cannot affirm the district court's summary judgment unless there are no remaining disputes of material fact:

DeNean Stafford
partnership all of his right, title and interest in and to the following property, agreed to be worth $100,000:
1. Preliminary drawings dated June 19, 1968, prepared by Lamberson, Plunkett and Shirley, Architects.
2. Budget estimates and documents dated September 6, 1968, of McDonough Construction Company.
3. Agreement to lease and loan commitment by Life Insurance Company of Georgia, dated July 2, 1968.
This January 21, 1969.

As noted in the previous panel opinion, 611 F.2d at 992, n. 3, "Stafford does not argue that the architects' renderings or contractors' estimates constitute property within the meaning of § 721." The July 2 letter of intent is the only item in the assignment that Stafford now argues was property for purposes of nonrecognition treatment.

7. There is no tax dispute over the two partnership shares that Stafford purchased.

[W]here ... the parties disagree as to the facts and take inconsistent legal theories, the mere filing of cross-motions for summary judgment does not warrant the entry of such judgment. *Vetter v. Frosch,* 599 F.2d 630, 632 (5th Cir.1979); *Schlytter v. Baker,* 580 F.2d 848, 849 (5th Cir.1978); .... [T]o justify entry of summary judgment here the government must have borne the heavy burden of demonstrating that there is no dispute as to any material facts with the evidence and all inference drawn therefrom viewed in the light most favorable to the taxpayers .... On review we apply the same standard.

*Shook v. United States,* 713 F.2d 662, 665 (11th Cir.1983). We conclude that the government has not met this high burden.

### III. EXCHANGE AND PROPERTY REQUIREMENTS

To qualify for nonrecognition treatment on the receipt of a partnership share, the partner must establish that he made a contribution of "property" in "exchange" for that share. I.R.C. § 721(a). Contrary to the district court's holding that the exchange and property requirements were not met, we conclude that these issues should have been decided in the taxpayers' favor. We will first state the proper resolution of the issues at hand.[8] In the final section of the opinion, we highlight the remaining factual issues that must be decided on remand.

#### A. *The Exchange Requirement*

##### 1. Generally

■ The district court held that Stafford's contribution of the letter of intent to the limited partnership was not an "exchange" for purposes of § 721. The court defined exchange as "a mutual or reciprocal transfer of one thing for another" and suggested that each side to the transaction must have a choice as to whether or not they desire the transfer. 552 F.Supp. at 313. Because transfer of the letter of intent to the partnership was part of the partnership agreement as drafted by the taxpayers' attorneys, the court found that the limited partners never had a choice as to whether or not the transfer would take place. *Id.* at 314.

The district court's opinion on this element lacks support in the language and principles of § 721. The regulations under § 721 specify that each partner "is entitled to be repaid his contributions of money or other property to the partnership (at the value placed upon such property by the partnership at the time of the contribution) whether made at the formation of the partnership or subsequent thereto." Treas.Reg. § 1.721–1(b)(1). That Stafford's contribution of the letter of intent was part of the partnership agreement at formation in no way undermines his argument that the contribution was part of an exchange with the partnership under § 721.

Furthermore, the purpose of § 721 is to facilitate the flow of property from individuals to partnerships that will use the property productively. *Cf.* B. Bittker & J. Eustice, *Federal Income Taxation of Corporations & Shareholders* ¶ 3.01 (4th ed. 1979) (discussing the purpose of tax-free exchanges between corporations and shareholders). By analogy, § 351 of the Internal

---

**8.** In its holding, the previous panel deciding this case noted but a single fact issue remaining in the record before it, namely, "What was the *quid pro quo* for Stafford's receipt of the twenty-first partnership interest?" 611 F.2d at 995. The panel concluded, based on conflicting testimony in the depositions, that a factfinder might determine that Stafford received his third partnership share in whole or in part as compensation for services he was to provide to the partnership. Finding a genuine issue of material fact in this regard, the court held that summary judgment for Stafford was inappro-

priate. This fact question remains disputed on the record before us and must be resolved by the factfinder on remand pursuant to the instructions set out in Section IV, *infra.*

The panel opinion went on to discuss several of the legal issues in the case. It did not, however, designate additional issues appropriate only for a factfinder. In this opinion, finding few disputes of material fact in the record before us, we rely upon the previous panel opinion to resolve many of the legal disputes in the case.

Revenue Code allows nonrecognition for individuals transferring property to corporations.[9] Indeed, post-transfer control of the transferee corporation by the contributing shareholder is a prerequisite to tax-free treatment under § 351. We therefore reject the district court's assumption that individual members of the transferee limited partnership must agree to the transfer before an exchange can occur under § 721.

The district court opinion focussed on the lack of agreement between Stafford and the limited partners. Viewed properly, the exchange that took place was between Stafford and the partnership, not the limited partners as individuals. *See Taxation of Partnerships, supra* note 10, ¶ 4.02[2] (Supp. 1983) (the district court's analysis in *Stafford* "is faulty, since the exchange in question was between Stafford and the partnership, not the limited partners"). The assignment of January 21, 1969, *see supra* note 6, tends to establish that such an exchange occurred. Stafford contributed the letter of intent and other items; the partnership issued the third share to Stafford. Again, that this exchange occurred at the formation of the partnership and without a formal partnership vote does not alter our conclusion that an exchange took place.[10]

### 2. Whether Stafford Owned the Letter of Intent

The previous panel opinion noted another possible resolution of the exchange requirement in the present case. Relying primarily on the decision in *James v. Commissioner,* 53 T.C. 63 (1969), the court stated that a question arose as to "who had ownership rights in the letter of intent before the purported assignment, Stafford or the limited partnership?" 611 F.2d at 997, n. 6. If the partnership owned the letter of intent, Stafford could not be said to have contributed that letter because it was not his to give. Thus, Stafford would not be eligible for nonrecognition under § 721 on his receipt of the third partnership share. A detailed examination of the record and application of the legal principles set forth in *James* leads us to conclude that Stafford owned the letter of intent and it was his property to contribute to the investment vehicle of his choice.[11]

In *James,* the taxpayer entered into an agreement with Mr. and Mrs. Talbot whereby he agreed to secure the necessary legal and architectural work and to arrange for the financing of a rental apartment project on the Talbots' land. Upon completion of the project, the Talbots would transfer their land to a corporation, which would

---

**9.** I.R.C. § 351 (26 U.S.C.A. (1982)) provides in pertinent part:

(a) General Rule—No gain or loss shall be recognized if property is transferred to a corporation by one or more persons solely in exchange for stock or securities in such corporation and immediately after the exchange such person or persons are in control (as defined in § 368(c)) of the corporation. For purposes of this section, stock or securities issued for services shall not be considered as issued in return for property.

The previous panel opinion noted that "I.R.C. § 351 is an analogous section [to § 721] concerning the transfer of property to a corporation." 611 F.2d at 991, n. 2. For purposes of determining the meaning of the terms "property" and "exchange" under § 721(a), noted commentators have made frequent reference to judicial and administrative decisions under § 351. *See* W. McKee, W. Nelson & R. Whitmire, *Federal Taxation of Partnerships and Partners* ¶ 4.01[1] (1977) (hereinafter "Taxation of Partnerships"). Finding the provisions and rationale of §§ 351 and 721 closely analogous,

we also will frequently refer to cases decided under § 351 while discussing the issues in the present case.

**10.** Even though such a "mutual agreement" is not required, the limited partners did in fact agree to the transfer by entering into the partnership. The October 30 letter to prospective limited partners, *see supra,* p. 1046, stated that Stafford's contribution of property was to be included in the partnership agreement. On the day the partnership was formed, the limited partners had full knowledge that Stafford would receive an additional partnership share in exchange for the letter of intent and other items. *See supra* note 6. As the district court itself stated, "[t]he investors could thus take the partnership agreement in the form it was offered or leave it." 552 F.Supp. at 313.

**11.** The previous panel did not indicate that fact disputes remained precluding disposition of this issue. We find no disputed facts on this issue in the record before us.

then issue stock to both the Talbots and the taxpayer. When James and the Talbots formed the corporation pursuant to the original agreement, James received 10 shares in the corporation in exchange for "property," described as a loan commitment from United Mortgage Servicing Corporation and an FHA commitment insuring the loan.

Two essential factors distinguish *James* from the instant case. First, the taxpayer in *James* was under agreement with the Talbots to perform the services that produced the loan commitments. By contrast, Stafford was under agreement to no one; when Stafford negotiated the terms embodied in the letter of intent, and when LOG issued the letter, Stafford was working on his own behalf. *Stafford v. United States,* 435 F.Supp. at 1038. Second, the loan commitment and the FHA commitment in *James* ran in favor of the corporation rather than the taxpayer individually, because the FHA regulations relevant to the transaction in *James* permitted commitments only to corporations and not to individuals. The *James* court thus held that the commitments belonged to the corporation and were not the taxpayer's to transfer. *James v. Commissioner,* 53 T.C. at 68. In contrast, the letter of intent in the present case expressly ran in favor of Stafford or his designee, *see supra* note 3.[12]

The government's reliance in the present case on *United States v. Frazell,* 335 F.2d 487 (5th Cir.1964), *cert. denied,* 380 U.S. 961, 85 S.Ct. 1104, 14 L.Ed.2d 152 (1965), is similarly misplaced. As in *James,* the taxpayer in *Frazell* was under an agreement with other parties to perform personal services, *i.e.,* Frazell was to locate potentially productive oil and gas properties for a partnership. In return for these services, Frazell received a salary and specified interest in the properties acquired. *Id.* at 488. Conversely, when Stafford obtained the letter of intent in 1968 he was working on his own behalf.

The facts in the record are not in dispute and compel a holding that Stafford owned the letter and was free to contribute it to the investment vehicle of his choice. Having thus concluded that Stafford owned the letter of intent and that his assignment of it met the exchange requirement of § 721, we turn to a discussion of the property requirement.

### B. The Property Requirement

■ The district court alternatively held that Stafford had not received his third partnership share as the result of a contri-

---

**12.** The previous panel opinion also relied on *Washburne v. Commissioner,* 27 T.C.M. 577 (1968), as authority for the proposition that the taxpayer must have ownership rights in the property transferred. 611 F.2d at 996–97, n. 6. The facts of that case also are distinguishable from the present case. In *Washburne,* the taxpayer negotiated the sale of the business he was working for to a separate corporation. After the separate corporation and the owner of the business had arranged for the sale, the taxpayer obtained an option to purchase the business from the old owner, which he then transferred to a new corporation recently formed by the purchaser. The court concluded that the "option" was issued at the taxpayer's insistence and was simply an attempt to create a tax-free transaction. The purchaser and seller had already agreed upon the sale terms before the option was executed. Thus, the court held that the option was a sham, the taxpayer transferred no property to the new corporation, and the stock issued to the taxpayer was compensation for his services in negotiating the deal.

In the present case, LOG issued the letter of intent out of its desire to "put the intent of the parties into something . . . that we could rely on." Aug. 16, 1977, deposition of Jason Gilliland (corporate counsel for LOG), at p. 8. Unlike the option in *Washburne,* the letter was not a summary of a deal already struck between the seller and purchaser of a business, it was a commitment from LOG to Stafford. Stafford had not yet contacted the investors who were later to form the limited partnership. The court in *Washburne* implied that if the taxpayer had negotiated the option independently, before contacting the purchasers, the transfer of the option for stock might have qualified for nonrecognition. The facts of the present case fit within what might have, but did not, happen in *Washburne.* Cf. *Ungar v. Commissioner,* 22 T.C.M. 766, 770 (1963) (when taxpayer had arranged individually for sale of real property prior to formulation of corporation to purchase, transfer of purchase contracts in exchange for stock in new corporation qualified for nonrecognition).

bution of "property." The court correctly stated that "the key to the benefit of non-recognition afforded by I.R.C. § 721(a) is that *property must be exchanged for an interest in the partnership.*" 552 F.Supp. at 314 (emphasis in original). The district court then stated as its test for property under § 721:

> After having carefully considered the arguments of counsel in conjunction with the opinion of the court of appeals, it is the opinion of the court that both *value* and *enforceability* are necessary to a conclusion that a document is "property" for purposes of § 721.

*Id.* at 415. Finding as a matter of law that the letter of intent was not enforceable, the court concluded that it was not property and the taxpayers were not eligible for nonrecognition under § 721.

We agree with the district court's conclusion that the letter of intent was not enforceable. Under Georgia law an agreement becomes enforceable when there is a meeting of the parties' minds "at the same time, upon the same subject matter, and in the same sense." *Cox Broadcasting v. National Collegiate Athletic Ass'n,* 250 Ga. 391, 297 S.E.2d 733, 737 (1982). In the present case, the July 2 letter of intent and Stafford's subsequent acceptance on August 30 did reflect an agreement on many essential terms; in particular, the parties were in agreement on the interest rate for the loan and the formula for calculating lease terms. However, the July 2, 1968, letter of intent acknowledged that "there were many details to be worked out" and stated only that "we [LOG] would like to continue our negotiations along the following general lines." The July 3 letter from LOG may have converted the proposal to negotiate to a firm proposal of major terms, but Stafford's response again made the execution of final lease and loan agreements expressly "subject to further negotiations" on several items. "Where it is evident from a written instrument, that the parties contemplated that it was incomplete, and that a binding

agreement would be made subsequently, there is no agreement." *Hartrampf v. Citizens & Southern Realty Investors,* 157 Ga. App. 879, 278 S.E.2d 750, 752 (1981), *citing Board of Drainage Commissioners v. Karr & Moore,* 157 Ga. 284, 299, 121 S.E. 298 (1923). *See also Russell v. City of Atlanta,* 103 Ga.App. 365, 119 S.E.2d 143, 145 (1961).

The agreement in the present case unambiguously contemplated resolution of additional items before execution of the final contract. "An agreement to reach an agreement is a contradiction in terms and imposes no obligations on the parties thereto," *Wells v. H.W. Lay Co.,* 78 Ga.App. 364, 50 S.E.2d 755, 758 (1949); as such, the agreement between Stafford and LOG embodied in the letter of intent and acceptance letter was unenforceable. *See Malone Construction Co. v. Westbrook,* 127 Ga.App. 709, 194 S.E.2d 619, 620–21 (1972) (agreement to agree held unenforceable). Stafford's contention that the parties intended to carry through with the terms of agreement set forth in the letter of intent is unavailing. Where, as here, the parties' written documents clearly and definitely make final agreement subject to mutually satisfactory future negotiations, we must decide as a matter of Georgia law that "the parties did not intend the letter agreement to be a binding, enforceable contract." *Dumas v. First Federal Savings & Loan Ass'n,* 654 F.2d 359, 361 (5th Cir.1981) [13] (applying Georgia contract law).

Nevertheless, notwithstanding its lack of legal enforceability, we still must determine whether the letter of intent was "property" within the meaning of § 721. The previous panel opinion stated that "enforceability of any agreement evidenced by the letter of intent, while perhaps not dispositive of the question, is important and material." 611 F.2d at 996 n. 6. We agree. An enforceable contract would perhaps be assured of property status; but the absence of enforceability does not necessarily preclude a finding that a document, substantially com-

---

**13.** In *Bonner v. City of Prichard,* 661 F.2d 1206 (11th Cir.1981) (en banc), this court adopted as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981. *Id.* at 1209.

mitting the parties to the major terms of a development project, is property.

Several nonenforceable obligations may rise to the level of property for purposes of § 721 or § 351. Unpatented know-how, which results from services and is not enforceable, nevertheless can be deemed property. *See generally Taxation of Partnerships, supra* note 10, ¶ 4.02[1], n. 17 (citing Rev.Rul. 64–56, 1964–1 (Part 1) C.B. 133 (the term property under § 351 includes unpatented secret processes and formulas); Rev.Rul. 71–564, 1971–2 C.B. 179 (transfer of exclusive right to use trade secret is property under § 351)).

The instant transfer of the letter of intent outlining the major terms of a proposed loan and lease agreement to which both parties felt morally bound is closely analogous to a transfer of goodwill, which, although clearly unenforceable, nevertheless has been treated as property. *See Taxation of Partnerships, supra* note 10, ¶ 4.02[1], n. 18:

> If goodwill is associated with a going business that is transferred to a partnership, there should be no question about the applicability of § 721. Furthermore, even if goodwill is associated with an individual who will remain active in the transferred business, an effective contribution of goodwill may be made.

*Citing* Rev.Rul. 70–45, 1970–1 C.B. 17 (for the proposition that a professional person realizes capital gain on partial sale of goodwill to newly admitted partners); *See also* Rev.Rul. 79–288, 1979–2 C.B. 139 (transfer of trade name and goodwill to newly formed foreign corporation is transfer of property for purposes of § 351); Rev.Rul. 70–45, 1970–1 C.B. 17 (goodwill of a one-man personal service business can be capital asset; whether it is an anticipatory assignment of income or a transfer of goodwill is a question of fact).

Thus, we conclude that the district court's requirement of legal enforceability as an absolute prerequisite to finding property status under § 721 was improper.

For purposes of our discussion as to whether the instant letter of intent is "property," we will assume arguendo that the factfinder on remand determines that the letter had value.[14] Under the appropriate legal standard and under the circumstances peculiar to this case, we conclude that the letter of intent encompassed a sufficient bundle of rights to constitute "property" within the meaning of § 721.

Although the Internal Revenue Code does not define property for purposes of § 721 or § 351, the courts have given the term rather broad application. *See E.I. DuPont de Nemours & Co. v. United States,* 471 F.2d 1211, 1218, 200 Ct.Cl. 391 (1973). In *Hempt Bros., Inc. v. United States,* 354 F.Supp. 1172, 1175 (M.D.Pa.1973), *aff'd,* 490 F.2d 1172 (3d Cir.), *cert. denied,* 419 U.S. 826, 95 S.Ct. 44, 42 L.Ed.2d 50 (1974), the court stated "that the term [property for purposes of § 351] encompasses whatever may be transferred." *Accord In the Matter of Chromeplate, Inc. (Chromeplate, Inc. v. District Director of Internal Revenue),* 614 F.2d 990, 995 (5th Cir.), *cert. denied,* 449 U.S. 842, 101 S.Ct. 123, 66 L.Ed.2d 50 (1980); *Stafford v. United States,* 611 F.2d at 995 n. 6; 3 J. Mertens, *Law of Federal Income Taxation* § 20.47, at 163 (rev. 1981).

The transfer of a taxpayer's full interest in a venture further supports a conclusion that the transferred item was property. *Cf.* Rev.Rul. 64–56, 1964–1 C.B. 133, 137 (evaluating the transfer of technical know-how from a United States corporation to a newly organized foreign corporation and stating that "[t]he transfer of all substantial rights and property of the kind hereinbefore specified [technical knowhow] will be treated as a transfer of property for purposes of § 351 of the code"). *See also* 3 J. Mertens, *supra,* ¶ 20.47 at 165.

As noted in the previous panel opinion, a taxpayer can create property by his provision of personal services. 611 F.2d at 995 n.

---

14. If the item asserted as property is valueless, then the § 721 will not apply. *See* Taxation of Partnership, *supra* note 10 at ¶ 4.02[1]. A determination regarding the value of the letter in the instant case is best left to the factfinder on remand.

6. *Accord United States v. Frazell,* 335 F.2d at 490–91; *James v. Commissioner,* 53 T.C. at 67; *Ungar v. Commissioner,* 22 T.C.M. at 770; Rev.Rul. 64–56, 1964–1 C.B. 133, 134; B. Bittker & J. Eustice, *Federal Income Taxation of Corporations and Shareholders* § 3.03 (4th ed. 1979); Mertens, *supra,* ¶ 20.47 at 165; Taxation of Partnerships, *supra* note 10 at ¶ 4.02[1]; A. Willis, *Partnership Taxation* § 10.02 (2d ed. 1976).

Finally, we have held that legal enforceability of the rights asserted as property is important, but not dispositive. *See also Stafford v. United States,* 611 F.2d at 996, n. 6.

In the present case, the letter of intent of July 2 played a unique role. LOG officials have testified that it is the only commitment of this type the company has ever issued and that the letter was part of what they viewed to be a special project. Because the hotel was adjacent to LOG headquarters, officials of the company were willing to provide both construction financing, a permanent mortgage, and a lease for land and airspace, all at terms very favorable to the developer. When Stafford and LOG had reached agreement on these terms, the company offered the letter of intent because "this was a very peculiar transaction and I think because the way it developed, and the way the negotiations went on, this was a proper instrument to put the intent of the parties into something that would be—that we could rely on." August 16, 1976, deposition of Jason Gilliland (corporate counsel for LOG), at p. 8.

Although not enforceable in a strict legal sense, the written documents—*i.e.,* the terms of the July 2 letter, together with the July 3 letter limiting availability of those terms to acceptance within 60 days, and Stafford's August 30 letter of acceptance wherein he agreed to the essential terms of the letter of intent, including the interest on the loan and the lease terms—represented an agreement on the major terms that was quite firm in the view of the parties. Both of the principals have testified that they felt bound by the terms of the letter.

*See* Gilliland deposition at 41; Dobbs deposition at 16; Oct. 14, 1976 deposition of DeNean Stafford at 41, 46. Two years subsequent to the letter, when market conditions made those terms very favorable to the partnership, the parties substantially adhered to the terms stated in the letter of intent. The letter clearly was transferable. The letter itself evidenced a commitment to Stafford "or his designee." *See supra* note 3. The principals have testified that from the outset they anticipated Stafford would transfer the letter to an investment group formed to develop the hotel. LOG officials attended meetings of the prospective partners and were aware that the letter would be transferred. Again, we note that even though Stafford transferred the letter to the partnership, LOG officials were willing to abide by the terms of the letter in subsequent dealing. If property "encompasses whatever may be transferred," *Matter of Chromeplate,* 614 F.2d at 995, then the letter of intent meets this test. In addition, the letter of intent that Stafford transferred to the partnership embodied his entire interest in the hotel development venture; he held nothing back.

A conclusion that the letter of intent is "property" under the instant circumstances comports with the purpose of § 721. Stafford exerted personal efforts on his own behalf in negotiating with LOG. When LOG and Stafford exchanged the letter of intent and acceptance in 1968, the government had not suggested that Stafford recognized taxable income. He could have completed the project as a sole proprietor without recognition of income based on his receipt of the letter. The purpose of §§ 721 and 351 is to permit the taxpayer to change his individual business into partnership or corporate form; the Code is designed to prevent the mere change in form from precipitating taxation. In keeping with this purpose, we can discern no reason to exclude Stafford's transfer of the letter of intent from the protective characterization as "property."

Stafford through his business reputation and work efforts was able to negotiate a

very promising development project with LOG. He obtained from LOG officials a written document, morally, if not legally, committing LOG to the major terms of a proposed loan and lease. The transferability of the letter is undisputed and Stafford transferred his full interest in the project to the partnership. We conclude that the letter encompassed a sufficient bundle of rights and obligations to be deemed property for purposes of § 721.[15]

For the foregoing reasons, we have concluded that Stafford's transfer of the letter of intent to the partnership met both the "exchange" and "property" requirements of § 721. However, the factual dispute identified by the previous panel remains unresolved on the record before us and, accordingly, we must remand.

## IV. THE *QUID PRO QUO* FOR STAFFORD'S RECEIPT OF THE PARTNERSHIP SHARE

█ The previous panel remanded for the factfinder to determine: "what was the

**15.** We emphasize the limited scope of our present holding. We are not saying that a letter of intent, which on its face does not state a binding agreement between the parties, will generally constitute property for purposes of § 721. Rather, our holding is limited to the letter and the facts in the present case.

**16.** As support for the services explanation the previous panel opinion noted that one of the investors in the limited partnership had testified as to discussions that took place between the partners, at which time they expressed an interest in compensating Stafford for the services he was to render to the partnership. 611 F.2d at 994–95 (discussing August 18, 1976, deposition of Alton F. Irby (one of the original limited partners)). Furthermore, Stafford worked as a general partner for Center Investments for 18 months before the partnership voted to pay him a salary. 611 F.2d at 992–93, n. 4.

Another factor also tends to support a finding that Stafford's partnership share was received in part for services. Officers from LOG have testified that much of their certainty that the development would take place was based on their confidence in DeNean Stafford. *See* Dobbs deposition at 18–23; Gilliland deposition at 45–46. Mr. Gilliland testified as follows:

Gilliland: Are you suggesting what my company would do if DeNean Stafford had walked out of this transaction.

*quid pro quo* for Stafford's receipt of the twenty-first partnership interest?" 611 F.2d at 995. The panel was concerned that a jury might find that Stafford received the partnership share wholly or partially in exchange for the services he was to provide as general partner. *Id.* Thus, even though Stafford contributed the letter to the partnership, the panel was unable to conclude that Stafford's contribution of the letter was responsible for his receipt of the third partnership share. This dispute remains; from the record we cannot ascertain whether the partnership was compensating Stafford for services to be rendered or for contribution of the letter of intent, or partially for both.[16]

On remand the factfinder could determine that Stafford received the partnership share wholly in exchange for the letter of intent he contributed to the partnership. If so, the nonrecognition principles of § 721 apply and Stafford is entitled to his refund. *See Ungar v. Commissioner,* 22 T.C.M. 766

Counsel: Yes.
Gilliland: I don't think our company would have gone through with it.
Counsel: Without Mr. Stafford?
Gilliland: Well, at that point, that is purely speculation, but we were in this deal because of Mr. Stafford.
In the view of the partnership, Stafford's continuing involvement in the project given his working relationship with LOG may have been more valuable than the letter of intent he had obtained. The factfinder thus might conclude that Stafford received his third partnership interest partially in anticipation of the services he was to provide as general partner in consummating the deal.

Conversely, the assignment letter of January 21, 1969, *see supra* note 6, unambiguously states that Stafford received the partnership share in exchange for property, namely the letter and other items. Mr. Irby's original affidavit supports that conclusion. Mr. Williams, another limited partner, also testified that the partnership share was given in exchange for Stafford's property contribution. *Stafford v. United States,* 611 F.2d at 994. The district court, in a hearing held prior to summary judgment for the government, heard testimony from a third limited partner, Mr. Jenson, who only vaguely remembered the transaction and whose testimony would support both the property and the services explanation for Stafford's receipt of the third partnership share.

(1963) (the taxpayer had negotiated contracts embodying the sale, financing, and leasing of real property and he transferred those contracts to a newly formed corporation in exchange for stock; the court held that the stock received in exchange for the contracts qualified for nonrecognition treatment under § 351). To support such a finding in this case, the jury necessarily must conclude that the letter of intent was worth at least $100,000 to the partnership.

On the other hand, it might be determined on remand that Stafford received the partnership share wholly as compensation for services, in which case the government's tax assessment was proper. See Treas.Reg. § 1.721–1(b)(1) ("the value of an interest in such partnership capital so transferred to a partner as compensation for services constitutes income to the partner under § 61").[17]

Finally, the factfinder might conclude that Stafford's receipt of the partnership share was partly in compensation for services and partly in exchange for property. If this is the case, the factfinder should determine the value of the property element (*i.e.,* the letter of intent) and the value of the services element (*i.e.,* the services to be rendered to the partnership by Stafford after formation of the partnership, including any value inherent in Stafford's continuing service obligation due to LOG's confidence in him, *see supra* notes 16 and 17, but excluding any salary paid to Stafford for such services), and allocate the $100,000 value of the third partnership share accordingly. *See Stafford v. United States,* 611 F.2d at 993 n. 5; *United States v. Frazell,* 335 F.2d at 490–91 (receipt of interest in partnership by taxpayer held partly in exchange

for services and partly in exchange for property; remanded for determination of value of the property, 269 F.Supp. 885 (W.D.La.1967)); Rev.Rul. 64–56, 1964–1 C.B. 133, 134 ("[w]here both property and services are furnished as consideration [for the receipt of stock in a § 351 transfer] ... a reasonable allocation is to be made"). Thus, if the factfinder determines that Stafford's receipt of the partnership share was partly in exchange for the letter and partly as service compensation, then he should prevail in his refund claim as to so much of the $100,000 share as was properly allocable to his letter of intent.

The district court's summary judgment in favor of the government is reversed and remanded for disposition not inconsistent with this opinion.

REVERSED and REMANDED.

---

**17.** The taxpayer argues that the partnership share he received could be worth no more than the value of the letter of intent he contributed. He grounds that argument on the premise that the partnership had only two assets on the date of formation, the $2,000,000 in equity contributed by the limited partners and the letter of intent. Under Georgia law (O.C.G.A. § 14–9–91), the partners would be repaid their capital contributions upon dissolution, leaving only the letter of intent as reimbursement for Stafford's third share. Stafford thus contends that if the letter was valueless, the partnership share he

received in exchange also was valueless and he could not be deemed to have received ordinary income from his receipt of the third share.

Stafford's argument, however, misstates the assets of the partnership on the date of formation. In addition to the $2,000,000 in equity and the letter of intent, the partnership also had the value of Stafford's obligation as general partner to work toward completion of the project on behalf of Center Investments. This continuing service obligation would include the value of LOG's confidence in Stafford's ability to consummate the venture.